**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

| | | |
|---|---|---|
| OSCAR SOTO,<br><br>*Plaintiff*,<br><br>v.<br><br>DET. REYNALDO GUEVARA, DET. BARBARA HEALY, DET. JOHN BOYLE, GERI LYNN YANOW, as special representative of DET. VICTOR GUTIERREZ and DET. JOHN TRAHANAS, DET. JANIT HOWARD, DET. BARNEY GRAF, DET. JOHN PALLOHUSKY, JOSEPH SALEMME, ROBERT BIEBEL, and the CITY OF CHICAGO, Illinois,<br><br>*Defendants*. | ) | Case No. 24-cv-12554<br><br>**JURY TRIAL DEMANDED** |

# SECOND AMENDED COMPLAINT

Plaintiff Oscar Soto complains against Defendants Reynaldo Guevara, Barbara Healy, John Boyle, Geri Lynn Yanow, as special representative of Victor Gutierrez and John Trahanas, Janit Howard, Barney Graf, John Pallohusky, Joseph Salemme, Robert Biebel, and the City of Chicago as follows:

## INTRODUCTION

1. Oscar Soto's life was turned upside down when corrupt former Chicago Police Detective Reynaldo Guevara and his co-conspirators entangled him in two different shootings that he had nothing to do with.

2. The two shootings occurred just 12 days apart. First, on July 5, 1997, Oscar Arroyo was shot in the chest and survived. Then, on July 17, Miguel Salas was shot and killed.

3. Not one piece of physical evidence ever connected Mr. Soto to either of the shootings, and the defendants had no reason to think he was responsible for it.

4. Instead, Mr. Soto's arrest, prosecution, and conviction were based entirely on evidence the defendants manufactured, including made-up confidential informants and false eyewitness identifications.

5. Defendants attempted to pin the Salas murder on Mr. Soto, but he was acquitted at trial. By the time of the acquittal, however, Mr. Soto had been detained in pretrial custody for almost two years.

6. While Mr. Soto maintained his innocence of the attempted murder of Arroyo, he faced continued detention for what could be years of fighting the second case through another trial. Because of the defendants' willful misconduct in framing him for a crime he did not commit, Mr. Soto accepted a plea of six years at fifty percent in order to guarantee that he would only remain in custody for nine more months.

7. The horrors Plaintiff endured are not an anomaly: Plaintiff is one of at least 46 people exonerated after being convicted as a result of corrupt homicide investigations by Chicago Police officers, including Defendant Guevara, whom the Illinois Appellate Court has called "a malignant blight on the Chicago Police Department and the judicial system."

8. On September 3, 2024, more than 27 years after Plaintiff's arrest, the criminal court vacated his conviction.

9. Plaintiff now seeks justice for the loss of his liberty and terrible hardship he endured and continues to suffer because of the defendants' misconduct.

## JURISDICTION AND VENUE

10. Plaintiff brings this action under 42 U.S.C. § 1983 and Illinois law to redress the defendants' tortious conduct and their deprivation of his rights secured by the U.S. Constitution.

11. This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331

and supplemental jurisdiction over his state-law claims under 28 U.S.C. § 1367.

12. Venue is proper under 28 U.S.C. § 1391(b) because Plaintiff lives in this judicial district and the events and omissions giving rise to his claims, including the investigation, prosecution, and trial resulting in Plaintiff's conviction, happened here.

## PARTIES

13. Plaintiff Oscar Soto is an individual living in Chicago. He spent more than three years wrongfully imprisoned for a shooting he did not commit, and he served another 3 years on supervised release.

14. At all relevant times, Defendants Reynaldo Guevara, Barbara Healy, John Boyle, Victor Gutierrez, John Trahanas, Janit Howard, Barney Graf, and John Pallohusky were officers in the Chicago Police Department acting under color of law and within the scope of their employment for the City of Chicago. Plaintiff sues each of these defendants in their individual capacity.

15. Geri Lynn Yanow, as the special representative of Victor Gutierrez, deceased, is named as a Defendant in her capacity as special representative for Victor Gutierrez, as successor in interest and to defend this action on behalf of Defendant Victor Gutierrez.

16. Geri Lynn Yanow, as the special representative of John Trahanas, deceased, is named as a Defendant in her capacity as special representative for John Trahanas, as successor in interest and to defend this action on behalf of Defendant John Trahanas.

17. At all times relevant to the events described in this Complaint, Defendants Joseph Salemme and Robert Biebel supervised the officers in the preceding paragraph. These Defendants participated in the misconduct alleged in this complaint and also facilitated, condoned, approved, and turned a blind eye to misconduct of the Defendants whom they

supervised.

18. The City of Chicago is an Illinois municipal corporation that employs or employed the above-named defendants. At all relevant times, each individual defendant acted as an agent or employee of the City.

## FACTS

### The Shooting of Oscar Arroyo

19. On July 5, 1997, Oscar Arroyo was shot outside his home. He survived the shooting, His girlfriend, D.B.,[1] was standing next to him when he was shot.

20. At the scene of the crime, Chicago Police Department detectives interviewed eyewitnesses.

21. One eyewitness described the shooter as a bald man with a goatee and a dark complexion. D.B. told the detectives on the scene that she did not get a good look at the shooter.

22. Eyewitnesses also told police that the shooter was sitting in the passenger seat of a white, two-door car with a dark roof.

### The Murder of Miguel Salas

23. On July 17, 1997, Miguel Salas was killed in a drive-by shooting. Salas was in a car when another vehicle, containing three individuals, opened fire on his car, striking and killing him.

24. Eyewitnesses reported seeing three teenagers between the ages of 17 to 19 in the offending vehicle. The vehicle was described as a brown or maroon two-door Buick Riviera. The shooter was described as having a shaved head.

[1] The names of witnesses are abbreviated to protect the privacy of third parties.

25. Police recovered physical evidence from the scene, including a discharged cartridge case and one fired bullet.

26. During the initial investigation, eyewitnesses identified two suspects from a photo array and a lineup as Salas's killers: Julio G. and Alex R.

27. No one was ever convicted in connection with the murder of Miguel Salas.

**Oscar Soto**

28. Oscar Soto did not fit the eyewitnesses' descriptions of the perpetrators in either of the shootings. At the time of these crimes, Mr. Soto was 25 years old. He had a full head of black hair and a light complexion.

29. He had a girlfriend and two young children. He was working at Sergio's Auto Parts and a pizza shop to help support his growing family.

30. Mr. Soto had nothing to do with either the Arroyo or Salas shooting.

**Defendants Frame Oscar Soto**

31. Instead of attempting to find the persons who actually shot Oscar Arroyo and Miguel Salas, the Defendants sought to pin both crimes on Mr. Soto, even though they knew he was innocent.

32. Defendant Healy, who was investigating both the Arroyo and Salas shootings, working in concert with the other Defendants, fabricated a report stating that a confidential informant told her that a member of the Maniac Latin Disciples gang named "Trouble D," a.k.a. Oscar Soto, was responsible for the Arroyo shooting.

33. Defendants Guevara, Healy, Boyle, Gutierrez, Trahanas and Howard then fabricated a false photo identification of Oscar Soto at a photo array in the Arroyo investigation

using eyewitness D.B., who had previously told officers that she did not get a good look at Arroyo's shooter.

34. Defendants never conducted a photo array or lineup with the other eyewitness who initially described the shooter as bald, goateed, and with a dark complexion—a description that did not at all match Oscar Soto.

35. Defendants also fabricated a report claiming that the Arroyo investigation revealed that the same offender committed both shootings. In reality, no evidence from the Arroyo investigation suggested that the two crimes had the same perpetrator or that Soto had been involved with the Salas murder.

36. Prior to the involvement of Defendants Guevara, Healy, Boyle, Gutierrez, Trahanas and Howard in the Salas investigation, handwritten notes from Defendants Graf and Pallohusky show that Julio G. and Alex R. were positively identified in a lineup as being in the shooter's vehicle.

37. At the same time that Defendants Guevara, Healy, Boyle, Gutierrez, Trahanas and Howard got involved in the Salas investigation, Graff and Pallohusky created a typed lineup report that falsely stated that none of the witnesses identified either Julio G. or Alex R.

38. Then, Defendants fabricated a false photo array identification of Oscar Soto in the Salas investigation.

39. Defendants began repeatedly contacting Mr. Soto's family and attorney, stating that he was wanted for both crimes.

40. Mr. Soto, aware that he was suspected and with nothing to hide, turned himself in to the Area 5 Police Station and told the Defendants that he was innocent.

41. Despite the lack of any evidence tying him to either crime, Defendants, including Defendants Guevara, Healy, Boyle, and Gutierrez, fabricated two lineup procedures that supposedly identified Mr. Soto as the shooter in both the Arroyo assault and the Salas murder.

42. Defendants had D.B. view lineups for both cases. While she did not identify Soto for the Salas murder, minutes later she supposedly identified Soto in a lineup for the Arroyo shooting. This identification was impossible without police manipulation, because she had not gotten a good view of the shooter, as she initially told police.

43. Defendants wrote police reports that falsely recounted the photo array and lineup procedures that they had performed. These reports falsely made it appear that Soto had been selected as the perpetrator during legitimate identification procedures, and they falsely made it appear as though Alex R. and Julio G. had been eliminated as suspects through purportedly legitimate identification procedures.

44. At the time of the lineups and Mr. Soto's arrest, there was no evidence that the same person committed both the Salas murder and the Arroyo shooting. The only actual evidence pointed to alternative suspects in the Salas murder.

**Defendants Suppress Their Investigative Misconduct**

45. The false police reports described above were approved by Defendants Salemme and Biebel.

46. The false reports were used to cover up evidence of Defendants' misconduct. They were provided to state prosecutors and became a basis for charging and prosecuting Plaintiff.

47. At all times, Defendants suppressed the true circumstances of their manipulative identification procedures and their interactions with witnesses in both the Arroyo and Salas investigations.

48. Defendants did not disclose their misconduct to Plaintiff or his attorneys.

49. At all times, Defendants Salemme and Biebel were aware of the Defendants' misconduct and their fabrication of a case against Plaintiff. These supervisors nevertheless intentionally ignored the Defendants' misconduct, and decided to make Plaintiff liable for a crime he did not commit, rather than directing the officers to find the person who had actually committed the crime. In addition, the supervisors of the Defendants explicitly authorized their investigative misconduct.

50. In addition, on information and belief, the Defendants suppressed and destroyed additional evidence still unknown to Plaintiff, which would also have shown Plaintiff's innocence.

**Mr. Soto's Wrongful Conviction and Imprisonment**

51. As a result of Defendants' misconduct and based on the false evidence they manufactured, Defendants arrested Mr. Soto for murdering Salas and shooting Arroyo.

52. There was no weapon or other physical or forensic evidence connecting Mr. Soto to the crime.

53. Nevertheless, Mr. Soto was charged with murder and attempted murder.

54. At trial, the State's case hinged entirely on false and manufactured identifications of Plaintiff from the photos and later in-person lineup.

55. Following the trial for the Salas murder, a judge found Mr. Soto not guilty on all counts.

56. While Mr. Soto maintained his innocence of the attempted murder of Arroyo, he accepted a plea to avoid facing another trial and a potentially longer sentence that could take him away from his young children and family for decades.

57. Without the eyewitnesses' false identifications, Plaintiff never would have been charged and convicted.

58. The following years of Mr. Soto's life were consumed by the horror of his wrongful imprisonment.

59. When his life should have just been beginning, Mr. Soto was instead locked away, deprived of the chance to be cared for by his family, raise his two young children, be with his girlfriend, get an education, develop skills and a career, and pursue his interests and passions.

60. Indeed, Mr. Soto was deprived of all the basic pleasures of human experience that free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

61. Mr. Soto never knew whether the truth would come out or whether he would be exonerated.

62. Mr. Soto's suffering did not end with his release from prison. Defendants' misconduct continues to cause Mr. Soto extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, rage, and other physical and psychological effects.

**Mr. Soto's Exoneration**

63. Mr. Soto steadfastly maintained his innocence before his conviction, after his trial and after his release from prison.

64. After spending three years behind bars for a crime he did not commit, Mr. Soto was released on parole in 2003. Mr. Soto remained under supervision for the next three years.

65. Defendant Guevara testified under oath in various civil rights lawsuits in the years following Mr. Soto's wrongful conviction. When asked during his testimony if he framed Mr. Soto for the Salas murder or Arroyo shooting, Guevara invoked his right to remain silent so as not to incriminate himself.

66. On February 28, 2024, as the extent of Guevara's rampant corruption was coming to light, Plaintiff filed a petition for relief from the criminal court's judgment and to vacate his conviction.

67. After conducting an investigation, the State did not oppose the petition.

68. On July 25, 2024, Judge Obbish of the Cook County Circuit Court vacated Mr. Soto's conviction. The State made a motion of nolle prosequi, and the Court dismissed all charges against him.

69. At the time of his exoneration, Mr. Soto had been fighting the false charges against him for more than half of his life.

**Chicago's Policy and Practice of Wrongly Convicting Innocent People in Violation of the Constitution**

70. The City of Chicago and the Chicago Police Department are responsible, by virtue of their official policies, for inflicting miscarriages of justice in scores of criminal cases like Plaintiff's case.

71. Since the 1980s, at least 100 cases have come to light in which Chicago police officers fabricated false evidence and/or suppressed exculpatory evidence to cause the convictions of innocent people for serious crimes they did not commit.

72. In many of these cases, Chicago police officers used the same tactics Defendants

employed against Plaintiff in this case, including but not limited to fabricating evidence, concealing exculpatory evidence, coercing confessions and statements through physical and psychological abuse, manipulating witnesses to influence eyewitness identifications and testimony, and using other tactics to secure the arrest, prosecution, and conviction of a person without probable cause or regard for the person's actual guilt.

73. At all relevant times, members of the Chicago Police Department, including Defendants in this action, routinely fabricated and manipulated identification procedures to procure suspect identifications they knew were inaccurate.

74. At all relevant times, members of the Chicago Police Department, including Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the Chicago Police Department and never disclosed to criminal defendants, their attorneys, or state prosecutors. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

75. Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including Defendants, concealed exculpatory evidence from Plaintiff.

76. The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of *Rivera v. Guevara*, No. 12-cv-4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10-cv-1168 (N.D. Ill.), and *Jones v. City of Chicago*, No. 87-cv-2536 (N.D. Ill.), among others.

77. The policies and practices of file suppression exposed in *Fields* were in place from the 1980s through the 2000s, including at the time of the investigation at issue here.

78. In addition, a set of clandestine files related to Area 5 homicides—the same detective division involved in this case—was found in the case of *Rivera v. Guevara*, No. 12-cv-4428 (N.D. Ill.). Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

79. The City of Chicago and the Chicago Police Department also routinely used illegal tactics, including torture, physical coercion, and psychological coercion, to extract involuntary and false confessions and statements from suspects and witnesses. There are over 250 documented cases of Chicago police officers using torture and coercion to illegally obtain confessions in homicide cases. The City knew about this widespread practice of procuring false and coerced confessions long before the events at issue in this case.

80. Moreover, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime. No Chicago police officer has ever been disciplined for misconduct in any of those cases.

81. Before and during the period in which Plaintiff was falsely charged and convicted, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

82. For instance, multiple witnesses have come forward with evidence that Defendant

Guevara was part of Miedzianowski's criminal enterprise. Guevara and Miedzianowski worked together in the CPD gang crimes unit before Guevara became homicide detective. Guevara used his status as a detective to advance the criminal drug enterprise he participated in with Miedzianowski, and to pressure drug dealers who did not do their bidding. Guevara's assistance included working with Miedzianowski to pin murders on innocent men.

83. In *Klipfel v. Bentsen*, No. 94-cv-6415 (N.D. Ill), a federal jury in Chicago returned a verdict against the City, finding it responsible for maintaining both a code of silence and a deeply flawed disciplinary system. This system allowed Chicago police officers (operating out of the very same police facilities as Defendants in this case) to operate a far-reaching, long-running criminal enterprise that included the subversion of homicide investigations.

84. The *Klipfel* plaintiffs were two former federal agents from the Bureau of Alcohol, Tobacco and Firearms who brought allegations of rampant criminal misconduct among gang crimes officers to the attention of CPD officials. The evidence in that litigation included: Philip Cline, an Area Commander and future Chief of Detectives and Superintendent, personally filed two Internal Affairs complaints against Miedzianowski for tampering in homicide investigations, that resulted in no discipline whatsoever; and Raymond Risley, an assistant deputy superintendent and head of Internal Affairs, who not only knew about misconduct in homicide cases but actively participated in efforts to subvert the disciplinary investigation into Miedzianowski that was at the heart of the *Klipfel* litigation.

85. Leaders of the Chicago Police Department and elected officials in Chicago have acknowledged a code of silence within the Chicago Police Department, condoned and facilitated by municipal policy makers and department supervisors. Under the code of silence, officers refused to report and otherwise lied about their colleagues' misconduct, including the

misconduct at issue in this case.

86. As a result of the City of Chicago's established practices, officers (including Defendants here) have come to believe they may violate civilians' civil rights and cause innocent people to be charged with serious crimes without fear of adverse circumstances. The practices that enable this belief include failing to track and identify police officers repeatedly accused of serious misconduct, failing to investigate cases where police were involved in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

87. This belief extends to Defendants in this case. For example, Defendant Guevara has a long history of engaging in the kind of investigative misconduct that occurred in this case. There are dozens of known cases in which Guevara and other Chicago police officers engaged in serious investigative misconduct similar to that described above. They engaged in such misconduct because they had no reason to fear the City of Chicago and its police department would ever discipline them for doing so.

88. The City of Chicago and its police department also failed in the years before Plaintiff's wrongful conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

a. The conduct of live lineup, photographic, and other identification procedures.

b. The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and how to ensure such evidence is made part of the criminal proceeding.

c. The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

d. The risks of wrongful conviction and the steps police officers should take to minimize risks.

e. The risks of engaging in tunnel vision during investigation.

f. The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

89. The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Plaintiff's wrongful conviction and his injuries.

90. The City's failure to train, supervise, and discipline its officers, including the individual defendants in this case, condones, ratifies, and sanctions the kind of misconduct that Defendants committed against Plaintiff.

91. The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

92. The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described in this complaint.

**Defendant Guevara's History of Framing Innocent Persons**

93. As a result of the Chicago Police Department's policies and practices described above, Defendant Guevara has framed dozens of innocent people over the span of two decades. These victims have lodged independent accusations of similar misconduct against Defendant Guevara.

94. As of the filing of this complaint, 46 people have had their convictions thrown out because of Defendant Guevara's misconduct. They are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Arturo DeLeon-Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, Geraldo Iglesias, Demetrius Johnson, David Gecht, Richard Kwil, Ruben Hernandez, Juan Hernandez, Rosendo Hernandez, Ray Munoz, David Lugo, Carlos Andino, Daniel Rodriguez, Jaime Rios, Jose Cruz, Marilyn Mulero, Nelson Gonzalez, Johnny Flores, Adolfo Rosario, Eruby Abrego, Jeremiah Cain, Edwin Davila, Alfredo Gonzalez, Gamalier Rivera, Madeline Mendoza, John Martinez, Jose Tinajero, Thomas Kelly, Louis Robinson, Edwin Ortiz, and Plaintiff Oscar Soto. These men and women served hundreds of years in prison for crimes they did not commit.

95. Guevara has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including obtaining false eyewitness identifications through manipulated identification procedures, manipulating witnesses, fabricating evidence, suppressing exculpatory evidence, and coercing false confessions and false statements from suspects and witnesses, and using physical and psychological violence, all in the course of maliciously prosecuting innocent people.

96. In addition to the cases in which individuals have been exonerated, there are dozens of other identified cases in which Defendant Guevara engaged in serious investigative

misconduct.

97. Given this extensive history of misconduct and the City of Chicago's failure to meaningfully supervise or discipline Guevara and others, it is apparent that Guevara engaged in such misconduct because he had every reason to believe the City of Chicago and its police department condoned his behavior.

98. Repeatedly, Guevara has invoked his Fifth Amendment right to not answer questions about allegations against him because truthful responses could subject him to criminal liability. Guevara has refused, for example, to respond to allegations that he manipulated dozens of witnesses to provide false identifications; fabricated false evidence; suppressed exculpatory evidence, including documentary evidence; tortured and abused suspects and witnesses and coerced false statements from them; and committed the misconduct detailed below.

99. The following are examples of Defendant Guevara's misconduct:

a. In 1982, Defendant Guevara and another officer arrested and physically assaulted Annie Turner for smoking on a bus. Guevara called her a "bitch" and pushed her out of the back door of the bus. He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke. He also hit her across the face with a metal bracelet he was wearing and called her a "nigger bitch." Turner sought medical treatment and filed a complaint with the Chicago Police Department's Office of Professional Standards (OPS).

b. In 1982, Defendant Guevara and three other officers broke through Almarie Lloyd's locked front door and conducted a warrantless search of her home. When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and her two children, and left the home in shambles. Lloyd filed a

complaint with OPS the next day.

c. In 1983, Defendant Guevara and other officers forcibly removed Leshurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was beaten on the head, face, and body until he confessed to murder and robbery. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep until he confessed. The criminal court suppressed Hunt's confession, and a jury returned a favorable verdict in a related civil rights action against the City of Chicago on Hunt's claim of excessive detention.

d. In 1984, Defendant Guevara and other officers physically assaulted Graciela Flores and her 13-year-old sister, Ana, during a search of their home. During the search, officers did not identify themselves as police. Guevara repeatedly slapped Graciela, called her a "bitch," and pulled her hair. As a result of this incident, Graciela's arm was put in a sling and she spent one week in the hospital.

e. In 1985, Defendant Guevara attempted to coerce a false statement from Reynaldo Munoz. Guevara handcuffed Munoz and put him in the back of a squad car. When Munoz denied any knowledge of the incident Guevara was asking about, Guevara repeatedly punched Munoz in the mouth. Guevara then took Munoz to rival gang territory where he allowed rival gang members to spit on and beat Munoz.

f. In 1986, Defendant Guevara threw Rafael Garcia against a car, struck him in the face several times, kicked him, and hit him in the head. Garcia filed a complaint with OPS. Guevara denied the charges, but OPS found Guevara had lied about the incident and recommended Guevara be suspended for two days.

g. In 1986, Defendant Guevara and two other officers coerced a confession from

Daniel Pena by beating him with their hands and flashlights.

h. In 1986, Defendant Guevara pulled over Melvin Warren because Warren cut him off while driving. Guevara called Warren a "nigger dog" and "threatened to tear [Warren's] head off." Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him. OPS sustained Warren's allegations that Guevara had physically and verbally assaulted him and recommended that Guevara be reprimanded.

i. In 1988, Defendant Guevara, in concert with his partner Steve Gawrys, and under the supervision of Ed Mingey, caused 12-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin. As a result, Rivera was wrongfully convicted of the Valentin murder.

j. Also during the Felix Valentin shooting investigation, Defendant Guevara falsely claimed the victim, Valentin, identified Jacques Rivera as his shooter before he died. Guevara reported to have obtained this identification at a time when the victim was in a medically induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him. Valentin could not possibly have provided the information that Defendant Guevara attributed to him.

k. In 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Guevara made Perez get inside his car, showed Perez a photo of Johnson, and told Perez he wanted Johnson to take the blame for the murder.

l. In 1989, Defendant Guevara also coerced Salvador Ortiz into making a false

identification of Juan Johnson, which Ortiz later recanted.

m. In 1989, Defendant Guevara coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz, saying that if Muniz did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

n. In 1989, Defendant Guevara coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not comply.

o. In 1989, Defendant Guevara coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime that he had nothing to do with.

p. In 1990, Defendant Guevara paid two juvenile witnesses to falsely identify a suspect from a photo array in a shooting investigation, leading to the suspect's wrongful conviction.

q. In 1991, Defendant Guevara coerced Wilfredo Rosario into making a false identification and giving false testimony before the grand jury. Guevara threatened that if Rosario did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. Guevara fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime. Rosario recanted his identification of Arcos at trial, but Arcos was still wrongfully convicted.

r. In 1991, Defendant Guevara told Efrain and Julio Sanchez to pick David Colon

out of a lineup. As a result, these men falsely accused Colon of committing a murder, though they later recanted citing Guevara's misconduct.

s. In 1991, Defendant Guevara coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. Guevara told Rivera that if he confessed, he would serve seven years in prison; if he did not confess, he would be sent away for 50 years. Guevara then promised Rivera that if signed a statement, he could go home.

t. In 1991, Defendant Guevara framed Demetrius Johnson for killing Edwin Fred. Guevara suppressed a lineup report documenting that a key eyewitness had identified a different person as the perpetrator in a lineup, and he fabricated a false police report to make it appear as if that identification had never occurred. Guevara also manipulated and fabricated three other eyewitness identifications of Johnson as the shooter.

u. In 1992, Defendant Guevara illegally prevented any adult or youth officer from being present while he interrogated juvenile Jacqueline Montanez. As a result, Montanez was wrongfully convicted of murder.

v. In 1993, Defendant Guevara coerced Carl Richmond into falsely identifying Robert Bouto as the murderer of one of Richmond's friends.

w. In 1993, Defendant Guevara arrested 15-year-old Eliezar Cruzado and threatened him with life imprisonment if Cruzado did not make a statement implicating himself in a murder. Guevara also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

x. In 1993, Defendant Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. During the two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face by Guevara, and beaten by two other officers. Frias-Munoz could hear his wife screaming and his son crying in another room. Guevara threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away. Frias-Munoz, who did not speak English, agreed to falsely confess.

y. In 1993, Defendant Guevara physically abused and threatened Francisco Vicente to coerce him into falsely implicating Geraldo Iglesias in a murder. Vicente later testified Guevara and other officers beat him, threatened him, and fed him facts to facilitate the false story.

z. In 1994, Defendant Guevara, after 14 hours of interrogation, coerced a confession from Adrian Duta by beating him and telling him he could go home if he signed a statement.

aa. In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained Davila to the wall of an interrogation room and told him that he was going to frame him for murder. After Davila maintained that he was uninvolved, Guevara forced Davila to participate in a lineup in which two witnesses falsely identified Davila as the perpetrator.

bb. In 1995, Defendant Guevara coerced Evelyn Diaz into making a false identification and providing false testimony to the Grand Jury by threatening Diaz that, if she did not falsely identify Luis Serrano as the shooter, the Department of

Children and Family Services would take away her children.

cc. In 1995, Defendant Guevara told Luis Figueroa to falsely identify Angel Diaz as the perpetrator knowing Figueroa did not see anything, causing Figueroa to be wrongfully convicted.

dd. In 1995, Defendant Guevara coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores. During Ortiz Bordoy's hours long interrogation, Guevara yelled in her face, swore at her, threatened that DCFS would take her children, and threatened to hit her.

ee. In 1995, Defendant Guevara coerced Rodolfo Zaragoza into falsely identifying Ricardo Rodriguez as the perpetrator of a shooting.

ff. In 1995, Defendant Guevara told Jose Melendez to falsely identify Thomas Sierra as the shooter of Noel Andujar, even though Melendez had not seen the shooter and told Guevara as much. In addition, Guevara wrote false reports saying Melendez and another man identified a car as the one used in the shooting.

gg. In 1995, Defendant Guevara coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of a interview room and refusing his requests for an attorney. During the 11-hour interrogation, Guevara yelled at him, slapped him, and told him if he did not confess, he would never see the light of day.

hh. In 1996, Defendant Guevara coerced Maria Rivera into making a false identification by unzipping his pants and propositioning her. Rivera later told the prosecutor she had falsely identified an individual in a lineup at Guevara's direction. The prosecution abandoned murder charges against that individual.

ii. In 1996, Defendant Guevara framed Louis Robinson for murder after Robinson

refused to pay Guevara protection money or falsely identify Guevara's chosen suspect in a different crime. Guevara coerced an eyewitness into identifying Robinson from a photo array and a lineup and fabricated evidence that Robinson lied about his alibi.

jj. In 1997, Defendant Guevara coerced Robert Ruiz into falsely implicating Freddy and Concepcion Santiago for the murder of Guevarra's nephew. Guevara detained Ruiz repeatedly over a 10-day period, locking him in an interrogation room without food, water, or access to the bathroom. Guevara told Ruiz who to identify and what to say in his statement.

kk. In 1997, Defendant Guevara coerced a false confession from Voytek Dembski by beating him while he was chained to a wall in a locked interrogation room. Guevara interrogated Dembski, a Polish national who did not speak English, without Miranda warnings, without notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

ll. In 1997, Defendant Guevara used threats and physical force against Ariel Gomez, Paul Yalda, and several of their co-defendants to try to get them to sign false statements incriminating Gomez in the shooting of Concepcion Diaz. Guevara also used pressure and threats to try to force three eyewitnesses, Ruth Antonetty, Debbie Daniels and Maria Castro, to falsely identify Ariel Gomez as the shooter even after they informed Guevara that they could not.

mm. In 1997, Defendant Guevara coerced witnesses into identifying Oscar Soto from lineups in two separate murder investigations, even though witnesses had

identified the true perpetrator of one of the crimes ten days earlier, before Guevara was ever involved in the investigation.

nn. In 1998, Defendant Guevara tried to extract a false confession from Rosauro Mejia by beating Mejia. Mejia never confessed and was finally released after being held in custody for three days.

oo. In 1998, Defendant Guevara repeatedly pulled Adriana Mejia's hair and struck her on the back of her neck while interrogating her.

pp. In 1998, Defendant Guevara repeatedly threatened and beat Arturo DeLeon-Reyes to coerce DeLeon-Reyes into giving an incriminating statement. After two days of isolation and interrogation, DeLeon-Reyes provided a false statement implicating himself in a murder in which he was not involved.

qq. In 1998, Defendant Guevara beat Gabriel Solache while Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false statement so the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

rr. In 1999, Defendant Guevara and his colleagues used physical violence to coerce David Gecht into adopting a fabricated statement, fed to him by Guevara, confessing to a shooting of which he had no knowledge.

ss. In addition, Guevara coerced Gecht's pregnant girlfriend, Colleen Miller, into falsely implicating Gecht in a shooting, telling her she would be arrested and her baby would be born in prison and taken from her if she did not cooperate.

tt. In November 2001, Defendant Guevara's girlfriend, Judith Martinez, attended a trial where Guevara was testifying and watched other witnesses' testimony. She

told Guevara about the other witnesses' testimony before he took the stand, in violation of a court order sequestering witnesses.

uu. In 2001, the FBI authored a special report detailing the criminal activity of Chicago police officer Joseph Miedzianowski and his associates, including Defendant Guevara. The FBI reported that Guevara, while acting as a police officer, solicited bribes from drug and gun dealers in exchange for the promise not to arrest them; took bribes to alter lineups of murder suspects; and took cash in exchange for dismissing murder cases he investigated.

vv. In 2011, the First District Appellate Court granted Tony Gonzalez a post-conviction hearing based on evidence that Defendant Guevara conducted an unduly suggestive lineup.

100. Neither the City of Chicago nor the Chicago Police Department ever disciplined Defendant Guevara for any of the above misconduct.

101. Indeed, Defendants engaged in the misconduct set forth in this complaint because they knew the City of Chicago and its police department tolerated and condoned such conduct.

**COUNT I**
**42 U.S.C. § 1983 – Violation of Due Process**
**(Fourteenth Amendment)**

102. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

103. As described above, Defendants while acting individually, jointly, and in conspiracy with each other, and under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

104. In the manner described above, Defendants fabricated witness statements falsely

implicating Plaintiff in the crime.

105. Defendants knew this evidence was false.

106. Defendants obtained Plaintiff's arrest and conviction using this false evidence, and they failed to correct fabricated evidence they knew was false when it was used against Plaintiff during his criminal case.

107. In addition, Defendants deliberately withheld exculpatory evidence from state prosecutors, Plaintiff, and Plaintiff's criminal defense attorneys, including evidence that Defendants had manufactured false identifications of Plaintiff, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

108. In addition, on information and belief, Defendants concealed, fabricated, and destroyed other evidence not yet known to Plaintiff.

109. Defendants also procured supposed eyewitness identifications of Plaintiff, which they knew were false and unreliable, using unduly suggestive procedures, and telling witnesses to identify Soto. Defendants caused the State to use those false identifications against Plaintiff at his criminal trial.

110. Defendants' misconduct caused Plaintiff's unjust and wrongful criminal prosecution and deprivation of liberty, violating his right under the Fourteenth Amendment to a fair trial. Absent Defendants' misconduct, Plaintiff's prosecution could not and would not have been pursued.

111. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and in total disregard of the truth and Plaintiff's clear innocence.

112. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and

suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

113. Defendants undertook the misconduct described in this Count pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below.

**COUNT II**
**42 U.S.C. § 1983 – Malicious Prosecution and Unlawful Detention**
**(Fourth and Fourteenth Amendments)**

114. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

115. As described above, Defendants individually, jointly, and in conspiracy with each other, and under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff. They did so without any probable cause  and despite knowing Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

116. In so doing, Defendants maliciously prosecuted Plaintiff, caused Plaintiff to be deprived of his liberty without probable cause, and caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

117. The misconduct described in this Count was objectively unreasonable, and Defendants undertook the misconduct intentionally and in total disregard of the truth and Plaintiff's clear innocence.

118. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

119. Defendants undertook the misconduct described in this Count pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below.

**COUNT III**
**42 U.S.C. § 1983 – Failure to Intervene**

120. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

121. As described above, during the constitutional violations described in this complaint, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights.

122. Defendants had ample, reasonable opportunities and the duty to prevent this harm but failed to do so.

123. The misconduct described in this Count was objectively unreasonable, and Defendants undertook the misconduct intentionally and in total disregard of the truth and Plaintiff's clear innocence.

124. As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

125. The misconduct described in this Count by the Defendants was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

**COUNT IV**
**42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights**

126. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

127. As described more fully above, Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to fabricate

evidence, suppress evidence, and coerce identifications to detain, prosecute, and convict Plaintiff, without regard for Plaintiff's guilt or innocence, and thereby to deprive him of his constitutional rights.

128. In so doing, these co-conspirators agreed to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect each other from liability for depriving Plaintiff of those rights.

129. In furtherance of their conspiracy, each co-conspirator committed overt acts and was otherwise a willful participant in joint activity.

130. The misconduct described in this Count was objectively unreasonable, and Defendants undertook the misconduct intentionally and in total disregard of the truth and Plaintiff's clear innocence.

131. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

132. Defendants undertook the misconduct described in this Count pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below.

**COUNT V**
**42 U.S.C. § 1983 – Municipal Liability Claim against the City of Chicago**

133. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

134. As described in detail above, the City of Chicago is liable for the violation of Plaintiff's constitutional rights because Plaintiff's injuries were caused by the City's policies, practices, and customs, as well as by the actions of policy-making officials for the City of Chicago.

135. At all relevant times, and for a period of time before and after Plaintiff's wrongful conviction, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: conducting photographic and live lineup procedures by officers and agents of the Chicago Police Department and City of Chicago; conducting interrogations and questioning criminal suspects; collecting, documenting, preserving, testing, and disclosing evidence; writing police reports and taking investigative notes; obtaining statements and testimony from witnesses; and maintaining investigative files and disclosing those files in criminal proceedings. In addition, or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for training and supervising officers and agents of the Chicago Police Department and the City of Chicago, with respect to these subjects.

136. At all relevant times, and for a period of time before Plaintiff's wrongful conviction, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, like Plaintiff, were routinely deprived of their right to due process. For instance, it was common that suspects were prosecuted based on fabricated evidence, including fabricated eyewitness identifications and eyewitness identifications obtained using manipulated photographic or live lineup procedures.

137. Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were coerced to involuntarily implicate themselves by various means, including the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals

were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training or knowledge of necessary safeguards against abusive conditions and involuntarily and/or false confessions; and (6) supervisors with knowledge of permissible interrogation techniques did not properly supervise or discipline officers and employees, causing coercive interrogations to continue unchecked.

138. In addition, at all relevant times and for a period of time before and after Plaintiff's wrongful conviction, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, including that officers: (1) did not record investigative information in police reports, maintain proper investigative files, or disclose investigative materials to prosecutors and criminal defendants; (2) falsified witnesses' statements and testimony; (3) fabricated false evidence implicating criminal defendants in criminal conduct; (4) failed to maintain or preserve evidence or destroyed evidence; and (5) pursued wrongful convictions through profoundly flawed investigations.

139. These widespread practices, individually and together, were allowed to flourish because the City of Chicago's leaders, supervisors, and policymakers directly encouraged and were thereby the moving force behind the very type of misconduct that occurred in Plaintiff's case. They did this by failing to adequately train and supervise their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline past instances of similar misconduct, which directly encouraged future abuses like

those affecting Plaintiff.

140. The above widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, both individually and together, because policymakers with authority exhibited deliberate indifference to the problem, thereby effectively ratifying it.

141. As a result of the City of Chicago's policies and practices, numerous individuals have been wrongly convicted of crimes they did not commit.

142. Defendants undertook the misconduct described in this Count pursuant to the City of Chicago's policies and practices in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

143. Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including the individually named defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

**COUNT VI**
**State Law Claim – Malicious Prosecution**

144. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

145. As described above, Defendants individually, jointly, and in conspiracy with each other, and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

146. In so doing, Defendants caused Plaintiff to be subjected improperly to judicial

proceedings for which there was no probable cause. Those judicial proceedings were instituted and continued maliciously, resulting in injury.

147. The judicial proceedings were terminated in Plaintiff's favor and in a manner indicative of his innocence when his conviction was vacated and charges against him were dropped in September 2024.

148. The misconduct described in this Count was objectively unreasonable and Defendants undertook the misconduct intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

149. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT VII**
**State Law Claim – Intentional Infliction of Emotional Distress**

150. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

151. Defendants' actions, omissions, and conduct described above were extreme and outrageous. Their actions were rooted in an abuse of power and authority. And their actions were undertaken with the intent to cause, or with reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

152. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT VIII**
**State Law Claim – Willful and Wanton Conduct**

153. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

154. At all times relevant to this complaint Defendants had a duty to refrain from

willful and wanton conduct.

155. Notwithstanding that duty, Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

156. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT IX**
**State Law Claim – Civil Conspiracy**

157. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

158. As described more fully in the preceding paragraphs, Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect each other from liability for depriving Plaintiff of his rights.

159. In furtherance of their conspiracy, each co-conspirator committed overt acts and was otherwise a willful participant in joint activity.

160. The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

161. The misconduct described in this Count was objectively unreasonable, and Defendants undertook the misconduct intentionally and in total disregard of the truth and Plaintiff's clear innocence.

162. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT X**
**State Law Claim – *Respondeat Superior***

163. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

164. While committing the misconduct alleged in the preceding paragraphs, the individual defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

165. Defendant City of Chicago is liable as principal for all torts committed by its agents.

**COUNT XI**
**State Law Claim - Indemnification**

166. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

167. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

168. The individual defendants were employees, members, and agents of Defendant City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

169. Defendant City of Chicago is responsible to pay any judgment entered against the individual defendants.

WHEREFORE, Plaintiff Oscar Soto respectfully requests this Court enter a judgment in his favor and against Defendants Reynaldo Guevara, Barbara Healy, John Boyle, Geri Lynn Yanow, as special representative for Victor Gutierrez and John Trahanas, Janit Howard, Barney

Graf, John Pallohusky, Joseph Salemme, Robert Biebel and the City of Chicago awarding compensatory damages, attorneys' fees, and costs against each defendant, punitive damages against each individual defendant, and any other relief the Court deems just and appropriate.

**JURY DEMAND**

Plaintiff Oscar Soto hereby demands a trial by jury under Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: 01/14/2026

Respectfully submitted

OSCAR SOTO

By: /s/ *Jon Loevy*
One of His Attorneys

Jon Loevy
Anand Swaminathan
Steve Art
Sean Starr
Alexandra Wolfson
LOEVY & LOEVY
311 N Aberdeen St, 3rd Fl
Chicago, IL 60607
jon@loevy.com